# THE COUNTY OF COOK

## *v.*

## THE CALUMET AND CHICAGO CANAL AND DOCK COMPANY.

*Filed at Springfield January 18, 1890.*

1.  RECORD OF JUDGMENT—*how far under the control of the court— during the term, and afterward—as, in awarding a new trial in ejectment, under the statute.* After the expiration of the term at which a new trial in ejectment has been awarded under the statute, the order for the new trial will become conclusive, and the court will have no power to set such order aside, even though all the costs have not been paid.

2.  Within a year from the entry of final judgment in ejectment, the court in which such judgment was rendered, will, on application of the unsuccessful party, have jurisdiction of the persons of the parties and of the subject matter, and its finding the payment of all costs, even though erroneous, and its judgment for a new trial, will, until reversed or set aside, be conclusive .on the parties. During the term the new trial is awarded, the court may set the order aside, but not after the term has expired.

3.  The court may, however, amend the record of a judgment, in mere matter of form, at a subsequent term, after notice has been given to the party to be affected thereby. This applies equally to the record of a judgment awarding a new trial in ejectment.

4.  SAME—*former decision distinguished.* The case of *Setzke* v. *Setzke,* 121 Ill. 30, is not in conflict with the ruling here. In that case there was no hearing of evidence of the payment of costs, followed by a formal judgment granting a new trial, but the order for a new trial was conditioned upon the payment of costs.

5.  APPEAL—*new trial in ejectment—under the statute.* If a party is not satisfied with a judgment for a new trial in ejectment, under the statute, he should preserve the evidence heard by the court by a bill of exceptions, and then, after a final disposition of the cause, the propriety of granting the new trial, as well as all other questions, can be reviewed on appeal or error.

6.  SWAMP AND OVERFLOWED LANDS—*rights of a county—as against purchaser from the United States.* Under the legislation of this State in relation to swamp and overflowed lands, the State of Illinois never intended to and did not transfer to the counties any of such lands as had been entered from the United States, but, on the contrary, the object was to protect the title of all purchasers from the United States.

7. The second section of the act of 1852 in relation to swamp lands, required the several counties to convey to the purchasers such of these lands granted to the State as might appear to have been before that time sold by the government to individuals, and the act of 1854 also required the county courts, by an order to be entered, to secure to such purchasers their titles. This left no discretion with the county authorities, but imposed a positive duty to protect all purchasers of swamp lands from the United States.

8. Under a fair and reasonable construction of the acts of 1852 and 1854, in relation to swamp lands, when considered in connection with the acts of Congress on the same subject, land bought in good faith from the United States never became vested in the county where situated, but passed to the purchaser on his entry.

9. PUBLIC LANDS—*vacating entry.* The Commissioner of the General Land Office has no authority of law to vacate an entry of public land, made without fraud, when the land was subject to entry.

APPEAL from the Circuit Court of Cook county; the Hon. A. N. WATERMAN, Judge, presiding.

Mr. E. R. BLISS, Mr. C. H. WILLETT, and Mr. CHARLES H. WOOD, for the appellant:

The court had no jurisdiction to try this case. Rev. Stat. chap. 45, sec. 35; *Pugh* v. *Reat,* 107 Ill. 440; *Oetgen* v. *Ross,* 36 id. 335; *Goodhue* v. *Baker,* 22 id. 263; *Golden* v. *Snellen,* 54 Ind. 282; *Setzke* v. *Setzke,* 121 Ill. 30; *Gibson* v. *Manly,* 15 id. 140.

The certificates from the Commissioner of the General Land Office and the State Auditor establish a title in fee in Cook county. Rev. Stat. U. S. sec. 891; *Railroad Co.* v. *Smith,* 41 Mo. 311; *Martin* v. *Marks,* 7 Otto, 345; *Dart* v. *Hercules,* 34 Ill. 395; *Piatt County* v. *Gumley,* 81 id. 350; *Jasper County* v. *Wadlow,* 82 Mo. 172; *Fremont County* v. *Railroad Co.* 22 Iowa, 91; *Keller* v. *Brickey,* 78 Ill. 133; *Bristol* v. *Carroll County,* 95 id. 88; *French* v. *Fyan,* 93 U. S. 169; *Fletcher* v. *Tool,* 20 Ark. 100; *Railroad Co.* v. *McDougal,* 113 Ill. 604; Laws of 1854, p. 19.

The certificate of the Commissioner of the General Land Office that the lands are swamp lands, is conclusive. *Bristol*

v. *Carroll County*, 95 Ill. 84; *Smith* v. *Goodell*, 66 id. 450; *Martin* v. *Marks*, 6 Otto, 345; *Wright* v. *Roseberry*, 121 U. S. 488; *Johnson* v. *Towsley*, 13 Wall. 73; *French* v. *Fyan*, 93 U. S. 169; *Ehrhardt* v. *Hogaboom*, 115 id. 67.

The act of Congress of March 3, 1857, confirmed the title to the land in question in the State. 11 U. S. Stat. at Large, 251; 10 id. 634; Rev. Stat. U. S. sec. 2450; *Emigrant Co.* v. *Railroad Co.* 47 Iowa, 515; *Smith* v. *Goodell*, 66 Ill. 450; *Funkhauser* v. *Peck*, 67 Mo. 20; *Martin* v. *Marks*, 7 Otto, 345; *McConnell* v. *Wilcox*, 1 Scam. 360; *Campbell* v. *Wortman*, 58 Ala. 258; *Gaston* v. *Stott*, 5 Ore. 60; *Fletcher* v. *Pool*, 20 Ark. 104; *Foster* v. *Evans*, 51 Mo. 39.

The plaintiff acquired a valid title under the Swamp Land acts of Illinois, as against the Egan claim of title. Laws of 1852, p. 178; Laws of 1858, p. 19; Laws of 1859, p. 201; *Smith* v. *Goodell*, 66 Ill. 450; *Dart* v. *Hercules*, 34 id. 395.

In ejectment, where law and equity exist and are separately administered, no equitable defense can be made. *Finlon* v. *Clark*, 118 Ill. 32; *Johnson* v. *Watson*, 87 id. 535; *Oldham* v. *Pfleger*, 84 id. 102; *Franklin* v. *Palmer*, 50 id. 202; *Chiniquy* v. *Catholic Bishop*, 41 id. 148; *Wales* v. *Bogue*, 31 id. 465.

Mr. JOHN B. COHRS, and Messrs. OSBORNE & LYNDE, for the appellee:

The finding of the circuit court that defendant had paid all costs, can not be reviewed in this court. *Becker* v. *Sauter*, 89 Ill. 596.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was an action of ejectment, brought by Cook county, against the Calumet and Chicago Canal and Dock Company, to recover the south-west quarter of section 7, town 37 north, range 15, east of the third principal meridian, except $46\frac{46}{100}$ acres. A trial was had before the court without a jury, and judgment was rendered March 1, 1886, for the plaintiff.

On the 16th day of September, 1886, the agent of the defendant paid to the attorney of the plaintiff a certain amount of money, which was supposed to be the amount of the costs in the case, and the attorney gave defendant a statement in writing, as follows:

"The costs in this suit have this day been fully paid by the defendant herein, and the clerk of the circuit court is hereby authorized to give said defendant a certificate of satisfaction therefor.

"*September 16, 1886.*"

Upon the presentation of the above paper to the clerk of the circuit court, that officer executed and delivered to the defendant a paper, which read as follows:

"*County of Cook*
v.      } Eject. No. 43,690.
*Calumet and Chicago Canal and Dock Co.*

"This is to certify that on the 16th day of September, A. D. 1886, all costs herein were paid in full to said date, and that no costs have since accrued herein.

"Dated this 21st day of January, A. D. 1887.

Henry Best, *Clerk.*"

On the 25th day of January, 1887, on motion of the defendant, the circuit court granted a new trial in said cause, under the statute. The order entered by the court was as follows: "It appearing to the court that said defendant has paid all the costs that have accrued in said cause to date, therefore, on its motion by its attorneys, it is ordered that a new trial of said cause be and the same is hereby granted, in pursuance of the statute in such cases made and provided." No bill of exceptions was prepared or executed to preserve the evidence heard by the court upon the hearing of this motion, upon which its finding was predicated, or to preserve any exceptions to the judgment entered. No steps whatever were taken to set aside this judgment during the January term of court at which it was rendered, but on the 16th day of April, 1887,

after the expiration of the year in which the defendant was entitled to a new trial, the plaintiff entered a motion to set aside the judgment granting a new trial, on the alleged ground that all the costs which had accrued in the cause were not in fact paid. This motion the court overruled, and upon a trial on the merits, judgment was rendered in favor of the defendant. The plaintiff excepted to the ruling of the court on the motion to vacate the judgment granting a new trial, and the decision upon that question we will first consider, before passing to the judgment of the court on the merits of the case.

On the motion to set aside the judgment granting a new trial, affidavits in regard to the amount of the costs, and the payment, were read to the court, and these affidavits have been preserved in a bill of exceptions ; but in the view we take of the question it will not be necessary to determine whether this evidence shows that all the costs were actually paid or not.

On the 25th day of January, 1887, when the circuit court heard the evidence and granted a new trial, it had jurisdiction of the parties and the subject matter, and the general rule is, that a judgment of a court of general jurisdiction, when it has jurisdiction of the person and of the subject matter, is conclusive, and can not be attacked in a collateral proceeding. Here, the judgment granting a new trial was rendered at the January term, 1887. No exception was taken to it, no appeal was taken from it, no writ of error was sued out to reverse it, nor was any motion made to set it aside during the term at which it was rendered ; and the question presented is, whether the circuit court had jurisdiction, at a subsequent term, to entertain a motion to vacate and set aside that judgment. We think the law is well settled that the court had no jurisdiction, at a subsequent term, to vacate the judgment or change it in any substantial manner. As early as 1860 this court held, in *Cook* v. *Wood*, 24 Ill. 295, "that after a term has expired, a court has no discretion or authority, at a subsequent term, to set aside a judgment, but may amend it in mere mat-

ter of form after notice has been given to the opposite party."
This decision has been followed in numerous cases, and the
rule announced may be regarded as the settled law of the State.
*National Ins. Co.* v. *Chamber of Commerce,* 69 Ill. 22 ; *Coursen*
v. *Hixon,* '78 id. 339 ; *Baker* v. *Palmer,* 83 id. 568 ; *McKind-
ley* v. *Buck,* 43 id. 488 ; *State Savings Institution* v. *Nelson,* 49
id. 171 ; *Smith* v. *Wilson,* 26 id. 186.

The fact that the judgment involved was entered in an
action of ejectment, and was one granting a new trial, does
not affect the question. The court, as appears from the judg-
ment itself, heard the evidence, and from the evidence pro-
duced, adjudged and determined that a new trial should be
granted. The judgment rendered, upon the evidence sub-
mitted to the court, was not conditional or interlocutory, or a
mere ruling or decision, such as a court may make on a ques-
tion of pleading or evidence during the progress of a trial,
but it was a final determination of a right conferred by the
statute, which right had to be determined upon evidence in-
troduced before the court, and no reason is perceived why a
judgment of this character should not be as binding and con-
clusive, and be treated in the same manner, as a final judg-
ment rendered in an action of assumpsit or in an action for
tort, upon evidence submitted to the court.

In *Oetgen* v. *Ross,* 36 Ill. 337, where the question arose as
to the power of the court to set aside a judgment by default,
in an action of ejectment, after the close of the term, it is said :
"It is urged by the counsel for the appellants, that the setting
aside a judgment by default is discretionary, and not the sub-
ject matter of review in this court. This is true, as a general
rule, but is not true when the question turns upon the juris-
diction of the court to make the order."

It has been decided in this court, in an extremely well con-
sidered case, (*Cook* v. *Wood,* 24 Ill. 297,) that the circuit court
has no power to set aside a judgment by default rendered at
a previous term, and the second judgment rendered, and the

judgment setting aside the default, were both reversed, and the case ordered to stand upon the first judgment. In the case before us the order setting aside the default was not made until more than a year after the original judgment, a term having intervened, and, so far as depended on the common law powers of the court, that order was a nullity. This decision has an important bearing on two aspects of the case under consideration: First, in holding that a judgment can not be vacated after the close of the term at which it is rendered; and second, in holding that a judgment granting a new trial in an action of ejectment is a final judgment, subject to review on appeal or writ of error. In *Becker* v. *Sauter*, 89 Ill. 597, the same question involved in this record arose, and we there held that a judgment granting a new trial in an action of ejectment could not be set aside or vacated, on motion, at a subsequent term.

Reliance is, however, placed on *Setzke* v. *Setzke*, 121 Ill. 30. That case is not in conflict with *Becker* v. *Sauter, supra.* There was no hearing of testimony in *Setzke* v. *Setzke* on a motion for a new trial, and a finding, on the evidence, that the costs had been paid, followed by a formal judgment granting a new trial. If there had been, the judgment, after the close of the term at which it was rendered, would have been conclusive. But the order granting a new trial was conditional upon the payment of costs within the year allowed by the statute. The costs never having been paid, no new trial was in fact ever granted. We do not think the case cited has any bearing on the question involved in this case. If the plaintiff was dissatisfied with the judgment entered by the court granting a new trial, and desired to have that judgment reviewed, the only way that object could be accomplished would have been to preserve the evidence heard by the court by bill of exceptions, and then, after a final disposition of the cause, that question, with all others, could be reviewed on appeal or writ

of error, as was done in *Oetgen* v. *Ross, supra.* That, however, was not done in this case.

In Freeman on Judgments it is said: "When, in an action to set aside a judgment, the court grants the prayer of the complainant, and awards a new trial, the order setting aside the judgment is a final judgment. *  *  *  The whole scope and object of the suit being to vacate the former judgment and to procure a new trial, and the issues all being made up for that purpose, their determination necessarily puts an end to the suit." In *Belt* v. *Davis*, 1 Cal. 134, it was held: "By a final judgment is to be understood, not a final determination of the rights of the parties in the subject matter of the litigation, but merely of the particular suit." The principle announced is applicable here. When the court rendered a judgment granting a new trial, such judgment was a final determination of the issues involved in the application.

The plaintiff, the county of Cook, claims title in fee to the land in controversy under what is known as the swamp land legislation. Under the act of Congress enacted September 28, 1850, entitled "An act to enable the State of Arkansas and other States to reclaim the swamp lands within their limits," followed by an act of March 2, 1855, entitled "An act for the relief of purchasers and locaters of swamp and overflowed lands," and an act of March 3, 1857, entitled "An act to confirm to the several States the swamp and overflowed lands selected under the act of September 28, 1850, and the act of March 2, 1849," all of the swamp and overflowed lands in the State of Illinois were donated to the State. Under an act of the legislature of the State, in force June 22, 1852, (Laws of 1852, p. 178,) and an act of March 4, 1854, (Laws of 1854, p. 19,) all of the swamp and overflowed lands were donated by the State to the counties, respectively. In connection with the acts of Congress and the acts of the legislature, the plaintiff introduced in evidence a certificate from the Commissioner of the General Land Office, showing that the land in question

had been selected as swamp land on the 29th day of October, 1853; also, a certified copy of a list of swamp lands, filed in the office of the State Auditor, including the land in question.

Conceding that the evidence introduced by the plaintiff was sufficient to establish, *prima facie,* a title upon which a recovery might be had if no evidence had been introduced by the defendant, the defendant claims that the evidence introduced by it was sufficient to overcome the case made by the plaintiff, and establish title in defendant. One defense relied upon was that the land in controversy was, by act of Congress, approved September 20, 1850, granted to the State of Illinois for the construction of the Illinois Central railroad; but in the view we take of the other evidence it will not be necessary to consider this branch of the case.

The defendant introduced in evidence a certificate of the register and receiver of the United States land office at Chicago, Illinois, dated October 20, 1853, showing that William B. Egan entered the land on that date with a land warrant No. 2495, and $1.25 per acre, cash, the price of the land having been advanced to $2.50 per acre. William B. Egan conveyed to Henry S. Monroe in April, 1854, and Monroe conveyed to James H. Bowen in May, 1871, and Bowen conveyed to the defendant in May, 1874. The land was assessed for taxes, and the taxes were paid, year after year, by Bowen and the defendant. There was, however, no evidence of seven successive years' payment of taxes under color of title while the land was vacant, or after possession was taken, so as to bring the defendant within the protection of the Statute of Limitations. It will be observed that the land was entered by Egan after the passage of the act of Congress granting swamp lands to the State. But the entry was made nine days before the land was selected as swamp land; and in this connection it may be remarked, that the fact is well known to all who have given the subject any consideration, that after the passage of the Swamp Land act of 1850, the various land

offices continued open, and lands were sold by the United States which were subsequently claimed by the States under the provisions of the Swamp act. This condition of things, no doubt, led to some of the legislation by Congress and the State of Illinois after the act of 1850, which will be referred to hereafter.

The first section of the act of 1850 provided that the whole of the swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and the same are hereby granted to the State of Arkansas. The third section provides that in making out a list and plats of the land, all legal subdivisions the greater part of which is wet and unfit for cultivation shall be included in said list; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom. The fourth section extends the provisions of the act to all States where swamp and overflowed lands may be situated. Under this act of Congress, had there been no other legislation on the subject, if the greater part of the quarter-section of land in question was wet and unfit for cultivation, within the meaning of the Swamp Land act, it is plain that the title to the land would have become vested in the State of Illinois.

After the passage of the act, the legislature of the State, on the 22d of June, 1852, passed an act granting the swamp lands donated by the general government to the State, to the several counties in which such lands were located. The second section of the act provided as follows: "Whenever it shall appear that any of the lands granted to the State by the aforesaid act of Congress shall have been sold by the United States since the passage of this act, it shall be lawful for the said counties to convey such lands to the purchasers thereof. The deed of conveyance shall be made by the judges of the county court, as such; * * * and on delivering said deed to the purchaser, the county judges shall take from him an assignment of all his rights in the premises, and as such assignees they shall be authorized to receive from the United States the pur-

chase money of said land; and whenever any lands embraced by the said act have been located by bounty land warrants, since the passage thereof, it shall be lawful for such county in which the same are situated, to convey the same, in manner aforesaid, to the person or persons who located said warrant, and to take an assignment of the same to them as county judges." The third section of the act directed the Auditor to furnish each county with an abstract of the swamp lands which have been purchased from the United States, or which have been located by land warrants, or to which the right of pre-emption has attached, since the passage of the Swamp Land act.

This act was amended by another act, passed on the 4th day of March, 1854. The first section of the amendatory act provides, that in all cases where any of the lands granted to the counties have been sold by the United States since the passage of the act of Congress of September 28, 1850, the county courts of the several counties shall, by an order to be entered of record at any regular or special meeting for the transaction of county business, make all necessary orders for securing such purchasers, since the passage of the Swamp Land act, of such swamp and overflowed lands. The act contains other sections calculated to protect persons in their titles who may have purchased swamp lands from the United States after the passage of the Swamp Land act, but it will not be necessary to set out in full these sections here. See Laws of 1854, p. 19.

After the passage of the two acts by the legislature of the State, Congress, doubtless with the same object in view,—the protection of the titles of purchasers,—on March 2, 1855, passed an act, the first section of which was as follows: "That the President of the United States cause patents to be issued, as soon as practicable, to the purchaser or purchasers, locater or locaters, who have made entries of the public lands claimed as swamp lands, either with cash or with land warrants or with

scrip, prior to the issue of patents to the State or States, as provided for by the second section of the act approved September 28, 1850, entitled 'An act to enable the State of Arkansas and other States to reclaim the swamp lands within their limits,' any decision of the Secretary of the Interior, or other officer of the government of the United States, to the contrary notwithstanding." Section 2 provided, that upon due proof by the State that any of the lands purchased were swamp lands, within the true intent and meaning of the act, the purchase money shall be paid over to the State in which the land was situated. See, also, act of Congress of March 3, 1857, (1 Lester's Land Laws.) This act, in substance, declared that the selection of swamp and overflowed lands granted to the several States, heretofore made and reported to the Commissioner of the General Land Office, *so far as the same* shall remain *vacant and unappropriated,* and not *interfered* with by an *actual settlement,* under any existing law of the United States, be and the same are hereby confirmed, and shall be approved and patented to the several States, provided that nothing in this act shall interfere with the provisions of the act of March 2, 1855, for the relief of purchasers and locaters of swamp and overflowed lands.

It is thus manifest, from the legislation of Congress and the legislation of the State, that it has always been the intention, both of the general government and of the State, to protect the title of a purchaser of swamp lands. Congress, in making the grant to the State, had the right to impose such terms and conditions as it saw proper, and the State, in granting the lands to the counties, had the undoubted power to provide that purchasers who had bought and paid for the lands should be protected in their several purchases, as, in effect, it did. The county of Cook derived its title to the land under and by virtue of the act of 1852, as amended in 1854, and if the acts do not pass the title to the land in question, it is plain that Cook county could not recover. The first section

of the act of 1852 is general in terms, granting all swamp lands which had been granted to the State, to the respective counties; but section 2 qualifies section 1, and declares that whenever it shall appear that any of the lands granted to the State shall have been sold, it shall be lawful for the said counties to convey such lands to the purchasers thereof. This was followed by an amendment, passed in 1854, requiring the county courts, by an order to be entered, to make all necessary orders for securing to purchasers of swamp lands their titles to such lands. Under this legislation it is manifest that the State of Illinois never intended to transfer to the counties lands that had been entered from the United States, but, on the other hand, the object was to protect the title of all purchasers. The language, "it shall be lawful for the said counties to convey," did not leave a discretion resting with the county, to hold the land or convey, as it might think proper, but a positive duty was imposed to transfer such title as it acquired, to the purchaser from the United States, and a county could acquire no rights to the lands by a refusal to observe the requirements of the statute. Indeed, we think it a fair and reasonable construction of the acts of 1852 and 1854, when considered in connection with the acts of Congress, to hold, that where lands had been bought, in good faith, from the United States, the title to such lands did not become vested in the county, but passed to the purchaser, under his entry.

The copy of the certificate of entry procured from the land office at Washington, and read in evidence, contained a statement written across its face, that the entry had been cancelled, and also another statement that it had been reinstated. The Commissioner of the General Land Office had no authority to vacate the entry, and any order that he may have made did not affect the rights of Egan. *Brill* v. *Stiles*, 35 Ill. 305.

In conclusion, we regard the decision of the circuit court as right, and the judgment will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE SCHOLFIELD, dissenting:

I concede that where a circuit court renders a *final* judgment upon insufficient evidence, the only mode of correcting the error is by preserving the evidence in a bill of exceptions, and then taking the record, by appeal or writ of error, before the proper appellate tribunal for review.   The circuit court retains no jurisdiction over a case after the expiration of the term at which *final* judgment is rendered, and hence has no jurisdiction, after that term, to correct it in a matter of substance.   But a *final* judgment is one that puts an end to the suit, at least until it shall be reversed or set aside.   3 Blackstone's Com. (Sharswood's ed.) 398, *399 ; Freeman on Judgments, sec. 21 ; 7 Am. and Eng. Ency. of Law, p. 967.   On the other hand, a judgment which is rendered as to some steps in the cause, without determining the rights of the parties in that suit, but leaving them to be determined by a further judgment, is interlocutory, (Freeman on Judgments, sec. 31,) and therefore an order granting a new trial in an action of ejectment which finally determines no rights of the parties in that suit, is not a final judgment.   (*Williams et al.* v. *La Valle et al.* 64 Ill. 110.)   Analogous cases are, *Bolton* v. *McKinley*, 22 Ill. 203, holding that a judgment vacating and setting aside a judgment entered up as by confession is not a final judgment ; and *Walker* v. *Oliver*, 63 Ill. 199, holding that a judgment vacating and setting aside a judgment by default is not a final judgment.   And to like effect are also *Branham* v. *Fort Wayne and S. Railroad Co.* 7 Ind. 524, and *Spaulding* v. *Thompson*, 12 id. 477.

The reference in the opinion of the majority of the court, to Freeman on Judgments, discloses nothing in conflict with this principle.   He is speaking of an action on bill or petition to set aside a judgment, and, of course, there, as he says, "the whole scope and object of the suit being to vacate the former judgment and to procure a new trial, and the issues

all being made up for that purpose, their determination necessarily puts an end to the suit," (sec. 18,) and that is all that is held in the authorities cited to sustain that statement. (*Belt* v. *Davis,* 1 Cal. 134; *McCall* v. *Hitchcock,* 7 Bush, 615.) There is here no suit to vacate a former judgment—there is simply an order in a suit in which a former judgment was rendered, vacating and setting aside that judgment, and suspending final judgment in the suit until after a subsequent trial shall be had. Until final judgment shall be rendered in the suit the whole record is before the court, and an interlocutory order or judgment may be corrected at any time. *Ogle* v. *Lee,* 2 Cranch, 33; *Brush* v. *Seguin et al.* 24 Ill. 254; *Constantine* v. *Foster,* 57 id. 36; *Kilmer* v. *The People ex rel.* 106 id. 529; *Fort Dearborn Lodge* v. *Klein,* 115 id. 177; *Setzke* v. *Setzke,* 121 id. 30.

In my opinion, the evidence shows that the costs were not all paid within the year, and hence the order granting a new trial was erroneously entered. The right to a new trial in such cases is purely statutory. We are not authorized to go beyond the letter of the statute, and be governed by what we may deem the peculiar equities in the case. What it says shall be done, must be done; and until that is done the court is without power to grant a new trial. *Oetgen* v. *Ross,* 36 Ill. 335; *Emmons* v. *Bishop,* 14 id. 152; *Goodhue* v. *Baker,* 22 id. 262; *Pugh* v. *Reat,* 107 id. 440. See, also, *Dawson* v. *Shillock,* 29 Minn. 89.

I therefore dissent from so much of the opinion of the majority of the court as holds that the court had authority to grant a new trial in the case.